UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MAJOR BARNETT, in his Capacity as Parent
and Guardian of Infant Plaintiffs M. B. and  N. B.,
and in his Capacity as President of the Broome
County Chapter of THE NATIONAL ASSOCIATION
FOR THE ADVANCEMENT  OF COLORED
PEOPLE; GAIL DANIELS, as Parent and Guardian
of Infant Plaintiff J. D.; and  YVETTE BARRON,
as Parent and Guardian of  J. B.;

                                        Plaintiffs,

-against-                                                          3:04-CV-0763


JOHNSON CITY SCHOOL DISTRICT;  LAWRENCE
ROWE, Superintendent of Schools, in his Individual and
Official Capacities;  MARGARET KUCKO, Principal
of Johnson City Middle School, in Her Individual and
Official Capacities;  and JOHN and JANE DOE, Employees
and Officials of Johnson City School District,

                                        Defendants.
_____

THOMAS J. McAVOY,
Senior United States District Judge


DECISION & ORDER

I.  INTRODUCTION

        Plaintiffs commenced this action asserting discrimination and civil rights claims pursuant to

Title VI of the Civil Rights Act of 1968, 42 U.S.C. § 2000d ("Title VI") and 42 U.S.C. § 1983, and

supplemental state tort and constitutional violation claims, for conduct occurring in the Johnson

City School District ("School District").  See Compl. ¶¶ 13-14, 16-81.  Before an Answer was

1

served, Defendants moved: (1) to dismiss the action pursuant to FED. R. CIV. P. 12(b)(6), or in the alternative, for summary judgment pursuant to FED. R. CIV. P. 56; (2) for an order striking the National Association For the Advancement of Colored People ("NAACP") as a party in the action if the matter was not dismissed *in toto*; and (3) to sever the parties in the action pursuant to FED. R. CIV. P. 42. See Defs. Not. Mot., dkt. # 5-1.   After considering Plaintiff's opposition, the Court determined to treat the motion pursuant to FED. R. CIV. P. 12(b)(6)[1] and granted it in part and denied it in part. See  2/2/05 Dec. &  Ord. [dkt. # 14].  In this regard, the Court dismissed certain claims in their entirety, dismissed all claims against all individual defendants, struck the NAACP as a party, and denied the request to sever the parties.  Plaintiffs did not seek to amend the Complaint following the February 2, 2005 Decision and Order despite that many claims were dismissed without prejudice to re-pleading.

Presently, only four plaintiffs remain in the case - M.B., N.B., J.D., and J.B.  Of these four, M.B., J.D., and J.B. have Title VI race-based disparate treatment claims against the School District, and all four have Title VI race-based hostile educational environment claims against the School District.  The School District moves for summary judgment pursuant to  FED. R. CIV. P. 56 seeking to dismiss all remaining claims.  Plaintiffs have opposed the motion.

## II.  STANDARD OF REVIEW

It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, see Tenenbaum v. Williams, 193 F.3d

---

[1]Plaintiffs opposed Defendants' initial  motion and cross-moved: (1) for leave to amend the Complaint, and (2) for leave to serve late notices of claim.  See Cross-Not. of Mot., dkt. # 6-1.  After Defendants filed opposition to the cross-motion, see dkt. # 9-7, Plaintiffs withdrew the cross-motion. Dkt. # 10. In opposition to the motion, Plaintiffs argued, *inter alia*, that they could not respond to that portion of the motion brought under Fed. R. Civ. P. 56 because they had not yet performed discovery. Therefore, the Court considered the motion only under Fed. R. Civ. P. 12.

581, 592 (2d Cir. 1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). A party seeking summary judgment bears the burden of informing the Court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the movant is able to establish a prima facie basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). While the Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in his favor, Abramson v. Pataki, 278 F.3d 93, 101 (2d Cir. 2002), a party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. Scotto v. Almenas, 143 F.3d 105, 114 (2d. Cir. 1998). Further, a party "cannot rely on inadmissible hearsay in opposing a motion for summary judgment . . . absent a showing that admissible evidence will be available at trial." Burlington Coat Factory Warehouse Corp. v. Esprit De Corp., 769 F.2d 919, 924 (2d Cir. 1985)(citations omitted); see also Hollander v. American Cyanamid Co., 172 F.3d 192, 198 (2d Cir. 1999), abrogated on other grounds, Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000)( "A court

may [ ] strike portions of an affidavit that are not based upon the affiant's personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements.").  As one legal treatise has succinctly stated, summary judgment requires the parties to "put up or shut up." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)(quoting  Fleming James, Jr. & Geoffrey C. Hazard, Jr., Civil Procedure 150 (2d ed. 1977)).

The Local Rules of the Northern District provide a mechanism for the efficient resolution of summary judgment motions.  See N.D.N.Y.L.R. 7.1(a)(3).  This mechanism places the onus on the parties to marshal the evidence that either supports, or defeats, the motion.  Monahan v. New York City Dep't of Corrections, 214 F.3d 275, 291 (2d Cir. 2000)(The Court's Local Rules require the parties "to clarify the elements of the substantive law which remain at issue because they turn on contested facts.").  The competing Local Rule 7.1(a)(3) statements are where the parties are to present the evidence that either supports or defeats a motion for summary judgment. See id. (The Court "is not required to consider what the parties fail to point out.")(internal quotation marks and citations omitted); Amnesty America v. Town of West Hartford, 288 F.3d 467, 470 (2d Cir. 2002)("We agree with those circuits that have held that FED. R. CIV. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.")(citations omitted).  "The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.  It does not, however, include attorney's affidavits."  N.D.N.Y.L.R. 7.1(a)(3).

## III.  BACKGROUND

The facts set forth in this Decision and Order are derived from the properly supported and/or

properly opposed Statements of Material Facts ("SOMF")[2] and from the depositions, affidavits, and

other admissible evidence presented.[3]  Where a dispute exists, the facts are set forth in the light most

favorable to Plaintiffs.  However, unsupported conclusory allegations that certain facts *might* exist

are insufficient to create a genuine question of material fact.   Because the case concerns claims by

four different Plaintiffs on two separate legal theories, the facts relevant to each Plaintiff's claims

will be addressed within the context of the Discussion on those  claims.

## IV.  DISCUSSION

### a.  M.B.'s Intentional Discrimination Claim

The First Cause of Action, brought "against defendant school district," is labeled as a claim

for "intentional discrimination."  See Compl. p. 9.  Plaintiffs allege that the infant plaintiffs were

each treated less favorably than white students with regard to discipline and/or class placement, and

that the motivations for the disparate treatment was racial.  The Court previously interpreted these

claims as brought pursuant to Title VI and held:

> In order to state a claim under Title VI, a plaintiff must demonstrate that: 1) the
> defendant discriminated against him or her on the basis of race; 2) that the
> discrimination was intentional; 3) that the discrimination was a substantial or
> motivating factor for the defendant's actions. Tolbert v. Queens College, 242 F.3d
> 58, 69 (2d Cir. 2001)(citations omitted).

Dec. & Ord., pp.7-8.

---

[2] Where the Court cites to one party's SOMF as supporting a factual proposition, the opposing party has either admitted the fact, or failed to provide a citation to the record where properly supported opposition to that fact can be found.

[3] Defendants contend that Plaintiffs "declined to depose any of the Defendants, any employees of the Defendant school district or any non-parties.  In addition, the Plaintiffs did not make any discovery demands of the Defendants." Def. Reply Mem. L., p. 8.  In opposition to Defendants' motion, Plaintiffs have supplied one affidavit from the mother of  two of the plaintiffs. See E. Barnett Aff. [dkt. # 19].  Other than that, Plaintiffs rely on citations to Defendants' exhibits (which include the plaintiffs' depositions).

The Complaint alleges that "black children are less likely to be placed in gifted programs where appropriate and are more likely to be held back." Compl. ¶ 22.  As to M.B., the Complaint further alleges that the School District failed or refused to place M.B. in a "gifted program" despite the child's aptitude for such a program, and that this failure or refusal was based on M.B's race.

The School District's Superintendent, Lawrence Rowe, has attested that "[t]he Johnson City School District does not operate a gifted program."  Rowe Aff. ¶ 21.  While the School District does operate an "EXCEL" program that "involves adding an additional teacher in some classrooms on a regular basis, which benefits all children in that class," the EXCEL program is not a program for gifted or advanced children, but instead benefits all the children in a particular class.  Id.  Further, according to Superintendent Rowe,  "[t]here has never been a request for M.B.  . . . to participate in the EXCEL program."  Id.

Plaintiffs counter these contentions with an affidavit from M.B.'s mother who attests that she "believed" the EXCEL program was a gifted program because of the way it was "presented" to her by school officials, and that she believed that M.B. was going to be referred to the EXCEL program but was not. E. Barnett Aff. ¶ 31.  M.B.'s mother also attests:

> I have an older daughter who is in high school and is involved in Odyssey of the Mind (OM).  Although anyone can join OM, I am aware that teachers often encourage students to participate.  I recently went to an OM tournament and, for the first time, realized there is an elementary OM team; no one has ever suggested to me or [M.B.] that [M.B.] might enjoy O.M.  No notes have been sent home nor have I received any calls suggesting OM.

Id. ¶ 32.

Despite M.B.'s mother's belief as to the nature of the programs offered by the School District, there is no basis upon which a reasonable juror could conclude that M.B. was excluded

6

from any educational program offered at the School District because of her race.  Plaintiff's contentions to the contrary amount to nothing more than unsupported speculation which is insufficient to withstand summary judgment.  See Bickerstaff v. Vassar College, 196 F.3d 435, 456 (2d Cir. 1999)("Bickerstaff's feelings and perceptions of being discriminated against are not evidence of discrimination.")(quotation and citation omitted).  Because Plaintiffs have failed to present evidence of an essential element of an actionable Title VI disparate treatment claim, M.B.'s claim in this regard is dismissed.  See Cudjoe v. Indep. Sch. Dist. No. 12, 297 F.3d 1058, 1070 (10th Cir. 2002)("Because [Plaintiff] has failed to show how [her son] was treated differently than students who are not African-American, we find that she has not presented a colorable claim under Title VI."). [4]

### b.  M.B. & N.B's  Hostile Educational Environment Claims

The Second Cause of Action, also brought against the School District, asserts a claim of a racially hostile education environment under Title VI.  Plaintiffs allege that M. B., and her brother, N.B., while students at Johnson City Elementary School, were subjected to racial taunting, teasing, and name calling in school and while riding on the school bus.  Despite bringing these events to the attention of school administrators, Plaintiffs contend that the School District failed to take appropriate action to curtail the racial hostility.

To succeed on a hostile educational environment claim, Plaintiffs must prove: (1) that the child  was subjected to a racially hostile educational environment, see Davis v. Monroe Co. Bd. of Educ., 526 U.S. 629, 650 (1999)(gender based hostile educational environment); Hayut v. State

---

[4] To the extent N.B. brings a similar claim, it too is dismissed for the reasons stated with regard to M.B.'s claim.

Univ. of N.Y., 352 F.3d 733, 744-745 (2d Cir. 2003); and (2) that the School District was

deliberately indifferent to it. Gant ex rel. Gant v. Wallingford Bd. Of Educ., 195 F.3d 134, 140 (2d

Cir. 1999)("[I]n cases of alleged student-on-student harassment, only deliberate indifference to such

harassment can be viewed as discrimination by school officials themselves."); see Bryant v.

Independent School Dist. No. I 38 of Garvin County, OK, 334 F.3d 928, 932-34 (10th Cir. 2003).

       To establish the first part of the test, Plaintiffs must prove that the environment was

permeated with racial hostility of such severity or pervasiveness so as to significantly alter the

conditions of M.B. and N.B's educational environments and thereby deny each of them equal access

to the School District's resources and opportunities. See Davis, 526 U.S. at 650; Hayut, 352 F.3d at

744-745.  "Finding the harassment 'pervasive' means that the challenged incidents are 'more than

episodic;  they must be sufficiently continuous and concerted.'" Hayut, 352 F.3d at 745 (quoting

Carrero v. New York City Hous. Auth., 890 F.2d 569, 577 (2d Cir. 1989)).  The standard requires an

environment that is both objectively and subjectively hostile. Hayut, 352 F.3d at 744-746. "Making

a 'hostility' determination in the educational context, as in the employment context, entails

examining the totality of the circumstances, including: 'the frequency of the discriminatory conduct;

its severity;  whether it is physically threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with' the victim's academic performance." Id. at 745 (quoting

Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 1993)).

       Deliberate indifference is, of course, a state of mind that Plaintiffs may establish by

demonstrating that school officials were made aware of the hostile environment, but chose to do

nothing about it. Bryant, 334 F.3d at 933-34; see Gant, 195 F.3d at 140 (discussing the deliberate

indifference standard).  "[D]eliberate indifference can be found when the defendant's response to

known discrimination 'is clearly unreasonable in light of the known circumstances.'" <u>Gant</u>, 195 F.3d at 140 (quoting <u>Davis</u>, 526 U.S. at 648).

Where a plaintiff asserts that school officials failed to appropriately discipline students perpetrating the harassment, the Court must give substantial deference to school administrators' determinations. <u>Davis</u>, 526 U.S. at 648 (Courts must "refrain from second-guessing the disciplinary decisions made by school administrators."). The standard is not one of mere reasonableness that "transforms every school disciplinary decision into a jury question." <u>Yap v. Oceanside Union Free Sch. Dist.</u>, 303 F. Supp.2d 284, 294 (E.D.N.Y. 2004). As the Second Circuit explained:

> The ultimate inquiry, of course, is one of discriminatory purpose on the part of the defendant [itself]. Thus, ... a plaintiff must show that the defendant's indifference was such that the defendant intended the discrimination to occur.

<u>Gant</u>, 195 F.3d at 140. "[T]he ultimate failure of [school official's measures to end the harassment by other students] does not mean that Plaintiffs have created a jury question with regard to deliberate indifference." <u>See</u> <u>Yap</u>, 303 F. Supp.2d at 294 (citing <u>Crispim v. Athanson</u>, 275 F. Supp.2d 240, 248 (D. Conn. 2003)(granting summary judgment in spite of an argument that the school's remedial and preventative measures proved insufficient)).

M.B. was deposed on December 20, 2005. <u>See</u> Def. Ex. 7. She was ten years old and in the fifth grade at the time of her deposition. <u>Id.</u> M.B., who is one of a set of triplets that includes her brother and co-plaintiff N.B., indicated that she understood her oath and what it meant to tell the truth. <u>Id.</u> pp. 4-5, 8. N.B. was also deposed on December 20, 2005, <u>see</u> Def. Ex. 6, and he sat in on much of M.B.'s deposition before his own depositions. <u>See</u> Def. Ex. 7, pp. 5-6. N.B. was ten years old and in the fourth grade at the time. N.B. also indicated that he understood his oath and the difference between telling the truth and telling a lie. <u>See</u> Def. Ex. 6.

Both M.B. and N.B. rode the bus together and both testified about the events of riding the bus pertinent to the allegations in the Complaint.  In this regard, M.B. and N.B. testified that while they were called names like "weirdo," "klutz," and "loser," they did not identify any racially derogatory names, and, in fact, denied that any students stated "you are black, you are black" as alleged in the Complaint.  See Def. Ex. 6, pp. 17-18;  Def. Ex. 7, pp. 25, 31-32.

M.B. also testified that while riding the bus, other students would not allow her and her brothers to sit down in the seats with them, and, at times, M.B. and her brothers sat or knelt on the floor adjacent to the emergency exit.  When the bus driver observed M.B. and her brothers without a seat, or when M.B. reported that the students would not let her sit down, the bus driver made the students move so M.B. and her brothers could sit on seats or returned to the school so the students would obey.  See Def. Ex. 7, pp. 19-21, 36-41.  There is no indication that the students' refusal to voluntarily offer M.B.  and N.B. a seat had anything to do with their race.  See Def. Ex. 7, p. 41-42.

In addition, M.B testified that students would throw "stuff" on the bus "like snacks they brought to school," and once or twice M.B. was hit by the items. Def. SOMF ¶ 11; Def. Ex. 7. p. 22-24.  When this occurred, M.B. told the bus driver who in turn told the students to stop and to put their snacks in their back-packs. SOMF ¶ 12; Def. Ex. 7, p. 24.  The bus driver also moved some of the students to the front of the bus. SOMF ¶ 12; Def. Ex. 7, p. 24.  There is no indication that the snack throwing incidents were racially motivated or that the infant plaintiffs believed that they were racially motivated.

Another event that occurred on the bus and highlighted by Plaintiffs was when M.B. was pushed by another student and hit her head against her friend's head. Def. SOMF ¶ 16. When M.B. told the teacher about it, the teacher sent her to the nurse.  Id. There is no indication that the pushing

10

event was racially motivated.

N.B. reported two physical confrontations on the bus, one involving a female student who pushed N.B. and another involving a male student who punched N.B. in the stomach. See id. ¶¶ 24-26. N.B. believes that his mother reported both incidents and, after she did, he had no further problems with these two students. Id. Again, there is no evidence indicating that either of these events were racially motivated. See Def. SOMF ¶¶ 27-28.

M.B.'s mother attests that while M.B. and N.B. might not "always recognize racial animus as such even when they are confronted with it first hand," she believes that M.B. and N.B. did experience racial animus on the bus because they got "off the bus in tears literally dozens of times" and told her of racially charged events. See E. Barnett Aff. ¶¶ 3-7. She surmises that the children may have "blocked out" the events, and she attests that she called school officials, including Superintendent Rowe, "at least 25 times . . . about racial slurs or physical abuse and spoke to Mr. Rowe about eight times." E. Barnett Aff. ¶¶ 4, 9. Superintendent Rowe attests that there are no reports or records involving M.B. or N.B.'s treatment on the bus, and, "[h]ad these things . . . been reported, disciplinary action would have been taken as appropriate." Rowe Aff. ¶ 14; see id. ¶ 18 (noting that the incident between N.B. and the female student was reported to the bus driver only).

While there may be a genuine dispute as to whether M.B. and N.B.'s treatment on the bus was reported to school officials, that dispute is immaterial because there exists no non-hearsay evidence establishing that M.B. and N.B.'s treatment on the bus - either by the other students or the bus driver - was racially motivated. Indeed, as indicated above, the children have specifically disavowed that they were taunted with racial name-calling. Whether the lack of evidence of racially-motivated treatment is because the children blocked out the memories or because it did not

11

happen, Plaintiffs have failed to meet their burden on summary judgment.

With regard to M.B.'s treatment in school, the record reflects that in the third grade she had a problem with a boy named Jason who occasionally picked on her.  Def. SOMF ¶ 9.  There is no evidence that Jason's conduct was racially motivated. Id. When Jason picked on M.B., she would report it to her teacher and "the teacher would speak to Jason and this seemed to help with Jason's behavior." Id. ¶ 10.  At other times, including during the fourth and fifth grades, other students would call M.B. "loser" or "klutz," or say they her brothers were "weirdos," but she reported no incidents of racial epithets.  Id. ¶¶ 6, 17.  When the name calling occurred, M.B.'s teachers responded by verbally admonishing the students and changing the seating arrangements so the offending students were not near M.B. Id. ¶ 7.  M.B. stated that she "really liked school in the third grade," described her time in fourth grade as "good," and said she was "getting along good" in fifth grade.  Id. ¶¶ 4, 5, 17.  On June 2, 2004, M.B.'s mother wrote to the school and said that M.B. had had a "great" year in school and requested that N.B. be placed in the same classroom the following year. See Def. ex. H.

None of the events described by M.B., either on the bus, in school, or *in toto*, rise to the level of an actionable race-based hostile educational environment.   There is no indication of race-related conduct by the students, and, for the most part, school officials responded to the non-racial teasing when they observed it or where made aware of it by a complaint.   To presume that the school officials did not take more aggressive discipline against the students that teased M.B. becuase of M.B.'s race is nothing more than unsupported speculation.  Therefore,  M.B.'s Title VI hostile educational environment claim is dismissed.

N.B. testified that he enjoys attending the School District's elementary school. Def. SOMF ¶

21.  He reported no race-based name calling, taunting, or teasing in school.  Id. ¶¶ 31-33.  For the

reasons discussed above with regard to M.B's Title VI hostile education environment claim, N.B.'s

claim also fails and is dismissed.

### c.  J.B.'s claims - Disparate Treatment and Hostile Educational Environment

Plaintiffs assert that J.B. was treated less favorably than white students with regard to

discipline in school, and was subjected to a hostile educational environment because the School

District failed to curtail racial animosity directed at him.  The School District asserts that J.B. was

treated fairly, appropriately and for non-racial reasons in all disciplinary matters, and that the School

District responded and curtailed all race-based conduct that it became aware of while J.B. was a

student.

J.B. was deposed on December 20, 2005 and, at the time, was twelve years old and in the

seventh grade. Def. SOMF ¶ 34.   J.B. testified that he understood his obligation to tell the truth and

that he would do so during the deposition.  See J.B. Dep. [Def. Ex. 8], p. 5.  At the time of the

deposition, J.B. was getting ready to start attending a new school on Long Island, New York.  Def.

SOMF ¶ 34.   J.B. had attended school in the School District since the second grade.  Id. ¶ 35.

During his deposition, J.B. testified that he "tries to act tough" in school, and has a short temper,

both of which have caused him to get into many fights in school. Id. ¶ 36. These fights were with

both white and black students, but, because the School District was predominately attended by white

students, he fought "mostly white" students. Id. ¶ 37.  J.B. has a long history of suspensions, and he

estimates that he had been suspended 5 times in the seventh grade and over 50 times while attending

school in the District.  See J.B. Dep. p. 20-21.  The 5 suspensions during the seventh grade were

because of fighting, threatening, disrespecting a teacher, and for grabbing the rear-end of a female

13

student.  Id.; Def. SOMF ¶ 48.  J.B. notes that while he grabbed the female student's rear-end, she also touched his rear-end and that both he and other student were both disciplined. Pl  SOMF  ¶ 48.  The five suspension that J.B. received during the seventh grade were imposed by a black school official.  J.B. Dep. p. 21.

J.B. described several incidents that took place while he attended school in the School District that Plaintiffs contend support J.B.'s claims.  The first involved an incident where a bus driver, who was trying to identify a white student who had just been involved in an altercation, called to J.B. from the front of bus and said (in substance):   "Hey you, black kid, what's that kid's name."  Id. pp. 10-12; Def. SOMF ¶ 38.  The incident was reported to the Superintendent by a fellow student on the bus, see Rowe Aff. ¶ 41, and once the District learned of the allegation, the bus driver was immediately suspended pursuant to § 1711 of the Education Law.  Id. ¶ 38.  Charges were then filed against the bus driver pursuant to Civil Service Law § 75.   Id.  Although the bus driver stated that the remark was not intended in a racially disparaging manner but rather as a way to identify the child whose attention he trying to attract, the bus driver was suspended without pay for 5 days as a penalty for his conduct. Id. ¶ 39.  J.B. indicated that the bus driver never made any other racial comments to him. Def. SOMF ¶ 41.

The second incident involved a situation that occurred when J.B. and three of his friends, two of whom were black and one white, were playing a game called "redneck."  See J.B. Dep. p. 17; Def. SOMF ¶ 44.  The game involved the students slapping the back of each other's neck.  Def. SOMF ¶ 42.  J.B. testified that on the day in question "he 'was really mad because something had happened' and was in no mood to play redneck with his friends." Id. ¶ 43.  J.B. asked his friends to stop slapping his neck and, when they did not, he retaliated by slapping the necks of the others.  Plf.

SOMF ¶ 45.  A substitute teacher who had been watching the boys playing the game yelled at J.B.,

grabbed him, and pushed him to the door.  Id.[5]  J.B. was angered because he felt the substitute

teacher's actions were unfair, so he told the substitute teacher not to touch him and threatened to

stab the teacher with a pencil. Id.; see also Def. SOMF ¶ 45.

Plaintiffs contend that the substitute teacher singled J.B. out because of his race.  J.B.

received a one day in-school suspension for the incident.  See Rowe Aff. ¶ 56.  Plaintiffs also

contend that the District's motivations for imposing such a harsh discipline were racial in nature.

However, Plaintiffs supply no facts upon which a reasonable fact finder could draw the conclusion

that either the substitute teacher or the School District's motivations were racially motivated.

Indeed, as J.B. testified, three of the four students involved in the incident were black, and,

according to J.B., all were conducting themselves similarly until J.B. grew tired of the game and

retaliated when his friends would not stop.  Further, even assuming that the substitute teacher's

conduct was racially motivated, there is no dispute that J.B. threatened to stab the teacher with a

pencil.  There is no indication that the School District's decision to impose a one day in-school

suspension was racially motivated or beyond the norm of discipline imposed upon students who,

like J.B., have long disciplinary histories and who make such serious violent threats to teachers.  See

Rowe Aff. ¶ 56.  Any argument to the contrary is based upon nothing more than mere surmise and

speculation. Accordingly, any disparate treatment claim arising from the discipline imposed for

J.B.'s threat to the substitute teacher is dismissed.

In June of 2004, when J.B. was in the sixth grade, he stabbed another student in the leg with

---

[5] Defendants contend that the substitute teacher told all the students to stop playing the game and that J.B. became quite confrontational causing the substitute teacher to call for assistance to remove J.B. from the classroom. See Rowe Aff. ¶ 55.

a pencil. Id. ¶ 55; Def. SOMF ¶ 46.  J.B. testified that he did not mean to stab the other student with the pencil and that both he and the other student had been poking each other with pencils prior to J.B. stabbing his pencil through the jeans and into the flesh of the other student. Def. SOMF ¶ 47. Apparently, J.B, stabbed the other student hard enough to cause the lead in the pencil to break off in the other student's leg.  Rowe Aff. ¶ 55.  J.B. felt that school officials did not listen to his explanation that the two were "only playing," that the incident was accidental, and that he was also stabbed by the other boy's pencil. Pl. SOMF ¶ 47.

After the school conducted what it felt was a thorough investigation in which J.B. admitted that he stabbed the other student "hard" but thought it was with the "eraser-end" of the pencil, J.B. was suspended for three days for the incident. Rowe Aff.   ¶ 55 and Ex. U.  The School District asserts that the three day suspension was appropriate given the seriousness of the conduct and the need to impress upon J.B. "the need not to react to these episodes with violence."  Id.  Plaintiffs contend that this discipline was racially motivated and in disparate proportion to discipline imposed upon white students who have engaged in similar behavior.  However, Plaintiffs present no evidence supporting their position and, like virtually all of their other arguments, rely upon nothing more then conclusory allegations and speculation to support their theory of racial motivation.

Based upon the present record, no reasonable fact finder could conclude that any of J.B.'s discipline was imposed for racially motivated reasons or that it was disparate from that imposed on similarly situated non-minority students.  See Def. SOMF ¶¶ 67, 69; see also J.B. Dep. pp. 23-24 (testifying that he received a 5-day suspension for touching a female student's rear end, but that his mother decided to keep him out of school for an additional week so he could "get [his] stuff together."); 28-29 (testifying that the times he has been suspended he has either had physical contact

with an other student or threatened a student or teacher); <u>see also</u> <u>Davis</u>, 526 U.S. at 648 (Courts

must "refrain from second-guessing the disciplinary decisions made by school administrators.").

Accordingly, any claim that J.B. might have for disparate treatment via discipline is dismissed.

    J.B. also asserts a race-based hostile educational environment claim.  He testified at his

deposition that he was called a racially derogatory name, "the 'N  word,'" on one occasion while a

student in the District. Def. SOMF ¶ 50.  After J.B. reported to school officials that he was called

this name, the student who uttered it received lunch detention and never called J.B. "the N word"

again.  <u>Id.</u> ¶ 51.  No one else ever called J.B. racial names, except for his black friends, who "use

'the N word' as a slang term of endearment." <u>Id.</u> ¶ 52.

    Taking all of the events occurring to J.B. in their totality, Plaintiffs fail to present evidence

from which a reasonable fact finder could conclude that J.B. was subjected to severe or pervasive

racially-motivated treatment or harassment while in school.  Further, and assuming arguendo that

such a finding could be made on this record, no reasonable fact finder could conclude that the

District was deliberately indifferent to J.B.'s treatment. On the few occasions when the school

learned of inappropriate race-based statements by staff or students, the District acted swiftly and

curtailed the conduct such that it did not reoccur.  Accordingly, J.B's hostile educational

environment claim against the School District is dismissed.

### d.  J.D.'s Claims - Disparate Treatment and Hostile Educational Environment

    When J.D. was a seventh grader, she became upset at a school function because she "felt

that her mother has been disrespected by white adults and their daughters" and began yelling at

these other people. Compl. ¶ 28.  According to Plaintiffs, a school employee told J.D. and another

black child that they needed "to act respectful, even if your parents aren't." <u>Id.</u>  Plaintiffs contend

that the black children's parents were not acting disrespectful, yet the employee was "neither counseled or disciplined for her inappropriate comments." Id. ¶ 31. Plaintiffs assert that the "district's lack of action thereon was racially motivated." Id. In this regard, Plaintiffs contend that, because of J.D.'s race, the School District did not conduct a proper investigation into the event, did not discipline or counsel the white children involved in the disturbance, charged J.D. with unsubstantiated claims of insubordination, improperly suspended J.D. after a hearing, and did not timely provide her with a tutor or in-home instruction in accordance with New York Law during her suspension. Plaintiffs also assert that J.D. was subjected to a racially hostile educational environment.

The event which led to J.D.'s complained-of suspension occurred on March 18, 2004 at a Family And Students Together ("FAST") program. The School District contracts for the FAST program which is put on by a local hospital and provides certain families within the School District with additional supportive services. See Rowe Aff. ¶ 33. The FAST program is held on School District property but is neither staffed nor run by School District personnel. Id. At the March 18, 2004 FAST program meeting, J.D. took offense to the way that a parent of another student was talking to her mother. J.D. became upset and told this parent to stop talking to her mother that way "before there has to be problems." Def. SOMF ¶ 56. J.D. allegedly started a disturbance and said that she would "throw a f - - - ing chair" at another girl. See Def. Ex. H. When a FAST program social worker attempted to speak to J.D. after she left the meeting, J.D. allegedly responded with vulgar and obscene language. Id. J.D. also allegedly bumped into another student on purpose and then verbally threatened the other student with violence, saying that she would "f - --k up the [other student's] nose." Id.

18

J.D. was initially suspended for five days for her conduct at the FAST program, and the matter was set for a due process hearing in accordance with New York Education Law § 3214. Rowe Aff. ¶¶ 21-24.   The due process hearing was originally schedule for March 31, 2004 but adjourned at J.D.'s request so that she could obtain counsel.  See Def. Ex. I (Recommendation of Hearing Officer).  J.D. was represented by counsel at the due process hearing that was conducted by Attorney Jon Blechman, an independent Hearing Officer. Id.; see also Rowe Aff. ¶ 22.

The hearing commenced on April 6, 2004 and, after three days during which both J.D. and the School District called numerous witnesses, concluded on April 13, 2004. Def. Ex. I.  Although J.D. testified that she had threatened to throw a shoe not a chair, the Hearing Examiner concluded that J.D. had engaged in essentially all of the conduct that she was charged with at the March 18, 2005 FAST program.  The Hearing Officer issued a written Recommendation in which he determined that the School District "established by clear,  convincing, and competent evidence that [J.B.] was insubordinate, disorderly, and engaged in conduct that endangered the safety, morals, health, and  welfare of others."  Def. Ex. I.   The Hearing Examiner recommended that J.B. be suspended for one calendar year, but that she be allowed to return to school the following September on the condition that she sign a "Contract of Conduct" that would suspend the punishment (in this case, the period of suspension) upon her return to school provided she did not violate any conduct-related terms of the contract. Id.

The Hearing Officer's recommendation was adopted by the School District.  J.D. appealed the School District's determination but withdraw the appeal upon reaching an agreement with the School District.  See Plf. SOMF ¶ 57; Rowe Aff.  ¶ 28-32 & Def. Ex. K & L.  This agreement, entered on May 18, 2004, allowed J.D. to immediately return to school under the terms of the

Contract of Conduct, and shortened the underlying term of suspension to June 30, 2004.  Rowe Aff. ¶ 28-32 & Def. Ex. K & L.  Superintendent Rowe attests that the School District agreed to allow J.D. back into the school sooner than recommended by the Hearing Officer because the School District "was interested in ensuring that the student was allowed back as soon as possible, and we were, at that time, determined that there would be a substantial change in [J.D.'s] behavior," not because the School District felt there was anything improper with its investigation or the Hearing Officer's conclusions and recommendation. Rowe Aff. ¶ 31.   During her period of suspension, the School District provided J.D. with a tutor as required by New York law,  Def. SOMF ¶ 61, although the record reflects that on many of the dates that the tutor went to J.D.'s home, J.D. was not at home or refused to open the door.  See Rowe Aff. ¶ 25 & Def. Ex. J.

The School District denies that J.D.'s discipline was based upon racial considerations, but instead was based upon the recommendation of the independent Hearing Officer who made his recommendation based upon the evidence presented at the hearing.  Rowe Aff. ¶¶ 21, 35-36.  The School District further asserts that the discipline imposed upon J.D. was comparable to that imposed on other students "who have misbehaved or engaged in similar violent or threatening conduct to that engaged in by [J.D.]." Id. ¶ 35.

Other than J.D's subjective belief that she has been singled out for discipline and her contention that the punishment imposed by the District for the FAST program incident was disproportionately harsh, she is unable to point to any specific instance of disparate negative treatment by the School District. Def. SOMF  ¶ 58.  Indeed, "J.D. admitted that the only way in which middle school teachers treated her differently involved a white social studies teacher who gave J.D. exceptionally good advice." Id.  ¶ 59.   Given the lack of any evidence of disparate

20

treatment, J.D. is unable to sustain her Title VI claim premised upon the discipline arising from the FAST program incident.  Since there is no evidence that any School District employee was involved in any of the conduct or statements made at the FAST program incident, J.D. is unable to sustain a Tile VI claims against the School District for its failure to investigate and discipline school employees for statements made at the March 18, 2004 event.  J.D.'s claim premised upon the purported denial of a tutor during her suspension is wholly unsupported and frivolous.  Therefore, all of J.D.'s Title VI disparate treatment claims are dismissed.

As to J.D.'s racially hostile educational environment claim, she denied that she encountered any racial problems while she attended school or that she witnessed any maltreatment directed toward any African-American students. J.D. Dep., Def. Ex. 9, pp. 27-28.[6]  Other than J.D.'s subjective beliefs that: (1) she was disciplined for the March 18, 20004 FAST program event because of her race; (2)  because of her race, sometimes she was kept waiting longer than she would have liked in order to speak to the Dean; (3) the school is "racists" because her older brothers told her so; or (4) black students seemed to be more likely to be blamed for conduct such as starting fights, she is unable to identify any race-based conduct to which she was subjected in school that the School District failed to curtail.  See J.D. Dep. pp. 19-22, 28-33.  J.D. fails to present admissible proof from which a reasonable fact finder could conclude that she was subjected to severe or pervasive conduct by students or administrators of a racial nature, or that, assuming *arguendo* that a racial hostile educational environment existed, that School District officials were deliberately indifferent to it.  Consequently, J.D.'s Title VI race-based hostile educational environment claim is

---

[6] J.D. was deposed on December 20, 2005.  Def. SOMF ¶ 54.  At the time she was 14 years old and in the ninth grade. Id.

dismissed.

**IV.  CONCLUSION**

For the reasons discussed above, Defendants' motion for summary judgment is **GRANTED** in all respects, and the case is **DISMISSED** in its entirety.  The Clerk is directed to close the file in this matter.


**IT IS SO ORDERED**

Dated:November28,2006


Thomas J. McAvoy
Senior, U.S. District Judge

22